**CONNECTICUT CAR RENTAL, INC., Plaintiff,**

v.

**PRIME ONE CAPITAL COMPANY, LLC, and BANK OF AMERICA; Defendants.**

No. 3:00–CV–2132 (WWE).

United States District Court, D. Connecticut.

Jan. 29, 2003.

George C. Springer, Jr., Butler, Norris & Gold, Hartford, CT, Joel M. Ellis, Hartford, CT, for Plaintiff.

Christopher M. Harrington, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT, John G. Dzurik, Goldstein & Peck, Bridgeport, CT, Joseph Carpello, Law Office of Joseph Carpello, Brea, CA, Bruce David Green, Fort Lauderdale, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EGINTON, Senior District Judge.

Plaintiff Connecticut Car Rental filed this interpleader action to determine the rightful recipient of certain car rental payments and/or sale proceeds pursuant to a lease agreement with Prime One. Prime One Capital Company and Bank of America represent the defendants claiming an interest in the subject property.

This case was tried to the Court on October 4, 9, 10 and 11, 2002, and January 13, 2003. The case is now fully briefed, and the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

**Formation and Operation of Prime One**

T & W Financial Services Company ("T & W") operated a specialized commercial company providing equipment financing primarily in the form of leases. T & W was headquartered in the Tacoma, Washington area, and was a subsidiary of T & W Financial Corporation, a publicly-traded company listed on the NASDAQ.

T & W funded its operations through warehouse lines of credit with lending institutions, and through the sale and transfer of leases to special purpose entities for the purpose of securitization.

Pursuant to an operating agreement dated July 10, 1998, Thomas Borzilleri, Joseph Pacifico, and T & W Financial Services Company formed Prime One Capital Company as a limited liability company under the laws of the State of Washington.

At the time Prime One was formed, Borzilleri was the sole owner of Signature Automotive Group ("Signature"), a company that operated a fleet vehicle leasing business headquartered in Florida. Pacifico was involved in a variety of family car dealerships and fleet leasing businesses located in the Philadelphia area.

Prime One's Certificate of Formation was filed with the Washington Secretary of State on July 9, 1998. Prime One's Certificate of Formation filed with the Washington Secretary of State provided that Prime One was a member-managed limited liability company.

Charles Dent, a T & W employee and in-house lawyer, signed the Certificate of Formation. Although Dent was a T & W employee, Dent was authorized to sign official documents on behalf of Prime One.

On August 17, 1998, Prime One also registered to transact business in the State of Florida. Prime One's limited liability company registration statement filed with the Florida Secretary of State provided that Prime One was a member-managed limited liability company, and Prime One listed each of its members as a manager.

Until T & W withdrew from Prime One in December 1999, T & W held a 51% majority interest in Prime One.

The Prime One fleet leasing business operated as follows. First, Prime One generated leases of fleets of vehicles to rental car businesses across the United States. Signature, or another licensed automobile dealer, then acquired vehicles on behalf of Prime One, which was not a licensed dealer. The fleet leases were thereafter assigned by Prime One to T & W. T & W paid Prime One for the purchase of the vehicles; Prime One paid Signature; and Signature then paid the manufacturer/dealer. T & W borrowed the money for the vehicles from lending institutions. These loans were secured by the leases.

**The Prime One Operating Agreement**

The Agreement of Prime One Capital Company, LLC, dated July 10, 1998, established the operations and governance of Prime One. Under the Formation Agreement, Borzilleri was to serve as the chief executive officer of the joint venture; Pacifico was to serve as the president; and Paul Luke, the chief financial officer of T & W, was also to serve as the chief financial officer and chief operating officer of Prime One. In addition to those titles, these three individuals also served as the members of a three person Prime One governing board, which was allocated certain powers under the agreement.

The Formation Agreement's recitals stated:

WHEREAS, Borzilleri and Pacifico have business contacts that are engaged in the commercial auto rental industry throughout the United States and Canada;

WHEREAS, T & W is in the business of financing the purchase or lease of various types of vehicles and related equipment (the "Financing") and has in place the equipment, systems, procedures, banking relationships and personnel necessary for the granting, processing and securing the Financing; and

WHEREAS, Borzilleri, Pacifico and T & W desire to form and operate a limited liability company under the laws of the State of Washington on the terms and conditions set forth below.

Accordingly, the Formation Agreement expressly contemplated that Prime One would originate rental car fleet leases, and that T & W would borrow funds from its lenders to pay for the automobiles which were the subject matter of those leases.

In Section 1.2(a), the Formation Agreement provided that Prime One's primary purpose was "to engage in the business of specialized commercial finance and equipment leasing using products, programs, services and other know-how of T & W and its employees."

Section 7.2 required the approval of the governing board for certain types of transactions, termed "Major Decisions", including transactions between Prime One and "a Member or its Affiliate." However, Section 7.2(b) of the Formation Agreement provided that governing board approval was required only if Prime One property was to be used for a purpose *other than* the purposes stated in Section 1.2. Thus, to the extent Prime One property was to be used "in the business of specialized commercial finance and equipment leasing using products, programs, services and other know-how of T & W and its employees," governing board approval was not required.

Similarly, Section 1.4 provided that the "Company's credit and Property shall be used solely for the benefit of the Company, and no Property of the Company shall be transferred or encumbered for or in payment of any individual obligation of any

Member unless otherwise provided herein." Section 1.9 granted to Prime One general powers consistent with the purposes of the agreement. This section delineated that Prime One had the power:

(a) To conduct and operate the business of the Company and to execute documents and instruments relating to the Company business; . . .

(g) To acquire, sell and exchange any assets consistent with the Company's purposes;

(h) To borrow from T & W, and to grant any lender(s) of T & W a security interest in all of the assets of the Company as security for any loans made to T & W in connection with the business of the Company; provided, however, that any funds borrowed from T & W shall be used solely for Company purposes; . . .

(j) To do all things necessary, incidental or convenient to the exercise of the foregoing powers and to the accomplishment of the Company's purposes.

Thus, the Formation Agreement specifically contemplated that Prime One vehicle leases would secure financing obtained by T & W, and transactions between Prime One and T & W would be needed to obtain that financing. Accordingly, an action that implemented assigning specific leases to T & W for funding was not a "major decision" to enter into "a transaction between the Company and a Member," and so did not require governing board action. When Prime One was formed, a decision had already been made to enter into transactions like the assignments from Prime One to T & W at issue in this case, which promoted the purposes for which Prime One was formed.

### Ordinary Course of Business at Prime One

The vehicles leased to Prime One lessees were purchased by Signature, which was a licensed dealer. Prime One paid Signature, or caused to be paid, approximately $100 million for those vehicles. Despite the magnitude of the money being exchanged between Prime One and Signature, a business wholly owned by Borzilleri and thus an Affiliate under the Formation Agreement, no governing board approval was ever obtained for these substantial payments.

With respect to the preparation and execution of lease assignments to T & W from Prime One, T & W circulated a policy memorandum establishing the signing authority of various T & W personnel, including Timothy Christomos, the Controller of T & W, Thomas Mahaffey, and Sheri Brady. Paul Luke specifically informed Timothy Christomos that Christomos could sign any document on behalf of Prime One that he could sign for T & W. T & W personnel routinely assigned Prime One leases to T & W in connection with its procurement of financing.

T & W personnel could act on behalf of Prime One, and did so with Borzilleri's knowledge and consent. Borzilleri knew T & W used warehouse lines secured by leases and eventually securitized pools of leases requiring true sales to others.

From Prime One's formation until the time of T & W's withdrawal in December, 1999, T & W was the exclusive source for all of the funding of Prime One's business.

### The Connecticut Car Rental Leases

On or about September 25, 1998, Prime One and Connecticut Car Rental entered into a Master Motor Vehicle Lease Agreement ("Master Lease Agreement"). Pursuant to this Master Lease Agreement, if and when Connecticut Car Rental had the need for additional vehicles, Connecticut Car and Prime One would execute lease schedules whereby Connecticut Car Rental would lease specified vehicles from Prime One.

Throughout their relationship, Connecticut Car Rental and Prime One executed numerous lease schedules. However, for purposes of this interpleader action, only two lease schedules are of concern: Lease Schedule No. 11 executed on or about June 15, 1999 for the lease of four Mercury Grand Marquis; and Lease Schedule No. 13 executed on or about June 17, 1999 for the lease of fifty Toyota Camrys. The auction sale of vehicles covered by these two lease schedules produced the interpleaded funds.

## Funding of the Connecticut Car Rental Leases

During the course of T & W's involvement with the Prime One joint venture, Prime One originated nearly $100 million dollars of leases, and consequently, T & W funded nearly $100 million of leases for Prime One.

While T & W generally paid Prime One for new vehicles by wire transfer of funds, eventually T & W paid Prime One by allowing Prime One to offset the cars' purchase price against various funds it owed to T & W, including money Prime One realized from the auction sales of cars returned on other leases or from cars returned to manufacturers.

Lease Schedule Nos. 11 and 13 were assigned from Prime One to T & W by written assignments signed by T & W employees Thomas Mahaffey and Sheri Brady. T & W paid Prime One the purchase price for the vehicles comprising the leases by agreeing that Prime One could offset those amounts against funds Prime One owed to T & W. T & W thus paid one hundred percent of the purchase price of the vehicles that are the subject matter of the leases. These offsets are confirmed in two spreadsheets created by Charlotte Brandon, an employee of Prime One, on or about October 1, 1999.

The spreadsheets show the offsetting process, and one of them reflects that the final balance of $819,156.31 at the end of a particular offset period was sent to T & W by Prime One. This wired payment to T & W concluded the particular offsetting process whereby T & W allowed Prime One to fund new leases with money owing to T & W. The Kia Tab spreadsheet shows that T & W paid Prime One, by way of offset, for the purchase of the four Mercury Grand Marquis covered by Connecticut Car Rental Lease Schedule No. 11. The Auction Tab spreadsheet shows that T & W paid Prime One, by way of offset, for the purchase of the fifty Toyota Camrys covered by Connecticut Car Rental Lease Schedule No. 13.

Brandon then forwarded the spreadsheets by e-mail to John Rosenlund of T & W. T & W employees, including Timothy Christomos and Tom Monin, then reformatted the documents and added ledger references for internal accounting purposes. The leases and values prepared by Prime One, as well as the balance column, were not changed by T & W. By virtue of the aforementioned assignments and purchase price offset, T & W paid for the leased vehicles and was the owner of the Lease Schedules.

## Bank of America's Loan to T & W

On October 22, 1999, T & W and Bank of America entered into a $40 million warehouse loan facility (the "Loan Agreement"). Under the Loan Agreement, T & W could draw funds down under the facility by pledging Bank of America collateral packages, consisting of equipment leases, attached schedules, and related documents.

In connection with the Loan Agreement, T & W and Bank of America executed a security agreement whereby T & W granted Bank of America a security interest in the leases and other documents

to be assigned to Bank of America. Bank of America perfected its security interest by filing UCC–1 forms in the relevant jurisdictions, including the States of Washington and Florida. Additionally, as collateral packages were pledged, Bank of America held the original leases, which also perfected Bank of America's security interest in them.

During November, and early December, 1999, Bank of America provided T & W approximately $39.5 million under the Loan Agreement in return for the assignment of eligible collateral. Specifically, T & W drew down funds from Bank of America under the Loan Agreement secured by the assignment of collateral to Bank of America, by way of two borrowing base certificates dated November 1, and November 5, 1999, which included the Lease Schedules.

The collateral packages received by Bank of America from T & W included the Connecticut Car Rental Master Lease, the Lease Schedules being pledged, and an assignment of the Lease Schedules from Prime One to T & W.

Bank of America never received notice, and had no knowledge, that T & W was unauthorized to assign, as collateral, the leases originated in the name of Prime One, as alleged in the instant action.

**T & W's Withdrawal from Prime One**

On or about December 1, 1999, T & W withdrew as a member of Prime One. Pacifico had previously withdrawn as a member.

Following T & W's withdrawal, Borzilleri became the sole member of Prime One. In connection with T & W's withdrawal, T & W and Borzilleri executed a Withdrawal Agreement. In Paragraph 4 of the Withdrawal Agreement, Borzilleri and Prime One made certain representations and warranties "with respect to leas-

es that have been originated by Signature Automotive Group, Inc. or the Company [Prime One] and subsequently assigned to T & W. Each lease is referred to herein individually as a 'Contract' and collectively as the 'Prime One portfolio.'"

This statement confirms that leases originated by Prime One had been assigned to T & W with the knowledge of Prime One's members, including Borzilleri. Thus, Borzilleri, who admits signing the Withdrawal Agreement, knew that the Prime One portfolio, which would have included the Connecticut Car Rental Leases, had been assigned to T & W.

Paragraph 4(f) of the Withdrawal Agreement provides:

> There is only one original of each Contract for purposes of the UCC as in effect in Washington or Florida and such original has been delivered to T & W.

Thus, Borzilleri acknowledged that the originals of the leases were in T & W's possession, which would indicate that T & W owned the leases.

Paragraph 5.1 of the Withdrawal Agreement provides that the agreement constituted "the entire agreement among the parties concerning the subject matter of this Agreement and supersedes any prior agreement or understandings among them, oral or written, all of which are hereby canceled."

Accordingly, to the extent Borzilleri contends that the Formation Agreement does not provide for assignments of leases to T & W for funding, this Withdrawal Agreement confirms the assignment process, and supersedes any prior agreements to the contrary.

**Bank of America's Purchase of the Connecticut Car Rental Leases**

At the end of 1999, T & W defaulted on its loan, and Bank of America declared the

full amount of the loan immediately due and payable. In February, 2000, Bank of America purchased from T & W most of the leases T & W had previously assigned to Bank of America as collateral, including the Connecticut Car Rental Leases.

On March 1, 2000, Borzilleri met with Thomas Brown of Bank of America in Seattle, Washington. At that meeting, Borzilleri asked Brown to extend Prime One a line of credit to be used, in part, to buy the leases originated by Prime One back from Bank of America. At that meeting, Borzilleri did not challenge Bank of America's ownership of leases originated by Prime One, including the Connecticut Car Rental Leases.

## CONCLUSIONS OF LAW

Since this is an interpleader action, both Bank of America and Prime One each carry its own burden of proof. At trial, each claimant is regarded as a plaintiff and must successfully prove its right to the interpleaded funds. *Midland Ins. Co. v. Friedgood,* 577 F.Supp. 1407, 1411 (S.D.N.Y.1984). Accordingly, both Bank of America and Prime One must establish their entitlement to the interpleaded funds by a preponderance of the evidence.

The Prime One Formation Agreement designated Washington law as controlling. Therefore, Washington law will apply to the interpretation of the Formation Agreement, and the various rights and obligations of T & W, Borzilleri, and Pacifico, who are each members of Prime One, will be determined under Washington law.

**T & W Had Actual Authority to Assign the Leases under the Formation Agreement**

■ The primary dispute in this action is whether T & W had authority to assign the leases pursuant to the Formation Agreement. This Court holds that it had actual authority to do so pursuant to the Formation Agreement.

To interpret a written contract, this Court must determine the intent of the parties. *Eurick v. Pemco Ins. Co.,* 108 Wash.2d 338, 340, 738 P.2d 251 (1987). However, as Justice Holmes wrote, a "word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). Accordingly, the Washington Supreme Court, recognizing that the intent of the contracting parties is not easily discerned from the words of the contract, adopted the "context rule," under which extrinsic evidence is admissible to assist the court in ascertaining the intent of the parties and in interpreting the contract, regardless of whether the language is deemed ambiguous. *Berg v. Hudesman,* 115 Wash.2d 657, 664–7, 801 P.2d 222 (1990).

*Berg* instructs that this Court should ascertain the contract's intent by examining the whole contract, its subject matter and objective, the circumstances surrounding its formation, the parties' negotiations and statements, their subsequent acts and conduct, course of dealing, industry practice, usage of the trade, and the reasonableness of the conflicting interpretations.

Review of the Formation Agreement reveals that the parties envisioned and authorized the assignment process at issue in this case. As indicated previously, according to Section 1.2(a) of the Formation Agreement, Prime One was to originate rental car fleet leases, and T & W was expected to borrow funds from its lenders to pay for the automobiles, which were the

subject matter of those leases.[1] The language of Section 1.2 reveals that T & W's infrastructure and lending relationships were considered essential to the Prime One operation.

Section 7.2(b) of the Formation Agreement expressly provided that governing board approval was required only if Prime One property was to be used for a purpose other than the purposes stated in Section 1.2. Thus, to the extent Prime One property was to be used "in the business of specialized commercial finance and equipment leasing using products, programs, services and other know-how of T & W and its employees," governing board approval was not required.

Acts taken in the ordinary course of Prime One's leasing business, which included assigning specific leases to T & W, did not constitute a "major decision" to enter into "a transaction between the Company and a Member," and so did not require governing board action. Borzilleri's business conduct is consistent with this interpretation in light of the fact that Prime One and Signature conducted approximately $100 million worth of business with no governing board action.

During the sixteen month period after the formation of Prime One, T & W personnel signed the Prime One lease assignments. This conduct was consistent with the general operations of both Prime One and T & W, since T & W personnel routinely acted for Prime One and T & W's other joint ventures.

Thus, the whole context of the Prime One Formation Agreement, including its business purposes and the parties' performance thereunder, demonstrates that governing board approval and execution was not required before leases could be assigned from Prime One to T & W for funding purposes.

**T & W's Assignments to Bank of America Are Binding under the Washington Limited Liability Company Statute**

■ Pursuant to Washington state law, T & W, as a member of Prime One, had the power to assign the leases at issue on behalf of Prime One. Prime One's Certificate of Formation filed with the Washington Secretary of State provided public notice that Prime One was a member-managed limited liability company. On the Certificate, Prime One answered "NO" to the question of whether Prime One management was vested in one or more managers. As a result, according to Washington statutory law, T & W, as a member of Prime One, had the statutory power to bind Prime One in its business dealings with third parties like Bank of America.

The Washington limited liability company statute makes each member of a member-managed limited liability company ("LLC") the agent for the LLC. Revised Code of Washington ("RCW") 25.15.150 provides, in relevant part:

Unless the certificate of formation vests management of the limited liability company in a manager or managers: (a) Management of the business or affairs of the limited liability company shall be vested in the members; and (b) *each member is an agent of the limited liability company* for the purpose of its business and the act of any member for apparently carrying on in the usual way the business of the limited liability company binds the limited liability company *unless* the member so acting has in fact no authority to act for the limited liabili-

---

**1.** Prime One's primary purpose was defined in Section 1.2(a): "to engage in the business of specialized commercial finance and equip- ment leasing using products, programs, services and other know-how of T & W and its employees."

ty company in the particular matter and the person with whom the member is dealing has *knowledge* of the fact that the member has no such authority. Subject to any provisions in the limited liability company agreement or this chapter restricting or enlarging the management rights and duties of any person or group or class of persons, the members shall have the right and authority to manage the affairs of the limited liability company and to make all decisions with respect thereto.

RCW 25.15.150(1)(b) (emphasis added). Therefore, pursuant to the Washington limited liability company statute, any member of a member-managed limited liability company can bind the company if apparently acting in the usual way of business unless the third party dealing with that member has actual knowledge that the member cannot bind the company.[2]

According to the evidence at trial, T & W's assignments of Prime One leases were in the usual course of business; and Bank of America had no actual knowledge that T & W lacked authority to bind Prime One, as alleged by Prime One. Therefore, even assuming that T & W did not have the actual authority to bind Prime One, T & W had the power to bind Prime One because T & W was apparently conducting Prime One's business in the usual way, and because Bank of America had no actual knowledge that T & W could not act for Prime One.

**T & W Had Apparent Authority to Make the Assignments**

 Consistent with the analysis above, the Court concludes that T & W also had apparent authority under the state common law to act for Prime One as its agent. In order to find apparent authority in this case, Bank of America must show statements or conduct by a principal that caused it (a third party) to reasonably believe that the agent had authority to act for the principal. *King v. Riveland,* 125 Wash.2d 500, 507, 886 P.2d 160 (1994). Apparent authority may be based either on the agent's position or title, or on the nature of the matters delegated or the control relinquished to an agent who holds no formal title or position. *Button v. Traders' Trust Co.,* 157 Wash. 625, 628–29, 289 P. 1010 (1930). The agent's authority may be proven by the agent's testimony. *Blake Sand & Gravel, Inc. v. Saxon,* 98 Wash.App. 218, 221, 989 P.2d 1178 (1999).

As stated previously, Prime One's official filings with the states of Washington and Florida specified that Prime One was a member-managed limited liability company. Since T & W was the member which held the majority ownership interest in Prime One, Bank of America reasonably believed that T & W and its employees were authorized to execute the Connecticut Car Rental lease assignments for Prime One. The assignments are effective based on this apparent authority.

**Prime One Ratified the Assignments**

 This Court concludes further that Prime One's knowing acceptance of the benefit of the funds generated by the assignments ratifies the assignments. A principal who accepts the benefits of an agent's unauthorized contract is estopped to deny the agent's authority. *Spokane Concrete Products, Inc. v. U.S. Bank of Washington,* 126 Wash.2d 269, 277–78, 892 P.2d 98 (1995) ("By retaining and using the benefit obtained, the corporation ratifies the contract.")

---

**2.** RCW 25.05.010(1) provides that a "person knows a fact if the person has actual knowl-edge of it."

As stated previously, the evidence at trial demonstrated that, in exchange for the assignments, T & W gave Prime One the benefits of the full amount of the cost of the vehicles. Charlotte Brandon, a Prime One employee under Borzilleri's supervision, prepared spreadsheets acknowledging that Prime One had been paid in full by T & W for the vehicles that were the subject of the Connecticut Car Rental leases.

The record does not support Prime One's position that the nearly $100 million that T & W provided in connection with the leases assigned to T & W represented unsecured, undocumented, interest-free intercompany loans to Prime One, and that T & W was merely Prime One's lease servicer.

**Connecticut Car Rental Had Notice of the Lease Assignments**

At trial, Prime One argued that Bank of America had not given sufficient written notice to Connecticut Car Rental of the assignment of the lease schedules to Bank of America. Therefore, Prime One contends that Bank of America is not entitled to collect from Connecticut Car Rental pursuant to the terms of the Master Lease Agreement.

With respect to the assignment of the lease, Paragraph 23 of the Connecticut Car Rental Master Lease Agreement provides:

> This Lease and all rights of Lessor hereunder shall be assignable by Lessor without Lessee's consent, but Lessee shall not be obligated to any assignee of Lessor except after written notice of such assignment from Lessor or Lessor's assignee.

In this instance, the Court is satisfied that Bank of America provided written notice to Connecticut Car Rental that Bank of America was the owner of the lease schedules. In fact, Connecticut Car Rental named both Bank of America and T & W as original parties to this interpleader action.

In addition, the notice requirement relates only to Bank of America's right to compel payment from Connecticut Car Rental. It has no bearing on the determination as to whether Bank of America or Prime One is entitled to the interpleaded funds. UCC 9–318(3), Rev. UCC 9–406(a) (chattel paper account debtor may discharge obligation by paying the assignor until, but not after, it has received notice of the assignment and direction to pay the assignee).

**The Doctrine of Judicial Estoppel Does Not Apply**

■ Prime One argues that Bank of America should be judicially estopped from asserting its claims in the present action based on certain pleadings filed in the T & W liquidation proceeding in the United States Bankruptcy Court for the Western District of Washington (the "D & O litigation"). Specifically, in this instance, Prime One takes issue with certain allegations made in the complaint by the T & W Litigation Trust on behalf of Bank of America concerning the leases and collateral for the loans.

Paragraph 11 of the complaint states, in relevant part,

> The Defendants breached their various duties to the Participating Lenders in various ways and on various occasions, including but not limited to, negligently misrepresented or allowed to be misrepresented financial information concerning the Debtors, the existence, ownership status, value, eligibility and extent of collateral securing loans made by the Participating Lenders, failing to exercise due care in managing the affairs of the Debtors, failing to adequately supervise the activities of Debtors' officers and board members, failing to perform

duties required by the By–Laws and/or Articles of Incorporation or other corporate documents of the Debtors, failing to exercise due care to assure the safekeeping and preservation of leases and lease proceeds that served as collateral for loans made by the Participating Lenders, failing to exercise due care to assure that security interests in favor of the Participating Lenders were perfected and preserved, failing to exercise due care to assure that Debtors received fair consideration for transfers of leases and failing to exercise due care to assure that the Participating Lenders' collateral and proceeds thereof were diligently collected, properly preserved, paid over and accounted for.

Paragraph 31 alleges that the officers and directors of T & W "negligently made" inaccurate and misleading statements of material fact to Bank of America concerning the financial condition of T & W and the "existence, value, ownership, eligibility, and extent of collateral" that T & W agreed to provide to Bank of America.

Paragraph 32 alleges that directors and officers of T & W failed "to exercise due care to assure that the funds loaned by Bank of America to the Debtors were used to fund the leases for which the funds were loaned thereby allowing the Debtors to misappropriate and convert loan funds."

This Court is unpersuaded that these allegations render Bank of America judicially estopped from taking its position relative to the validity of the T & W lease assignments in this action.

In *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), the United States Supreme Court explained that judicial estoppel is an equitable doctrine that is applied in the court's discretion to protect the integrity of the judicial process. As the Supreme Court elaborated, three key factors govern whether judicial estoppel applies in a particular case: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to accept the earlier position; and (3) the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. These three factors are not exclusive, and additional considerations may inform the doctrine's application in specific factual contexts.

As to the first factor, the Court finds that Bank of America did not previously advance a position clearly inconsistent to that asserted in the instant litigation. In the D & O litigation, the pleadings do not specifically address the issue crucial to this case that concerns whether T & W had the actual and/or apparent authority of T & W and its agents to assign Prime One leases on behalf of Prime One. Nor do the pleadings address the relationship of T & W to Prime One.

As to the second factor, the Bankruptcy Court accepted the litigation trust settlement as a fair and equitable one, but did not adopt any party's position as to the underlying facts or allegations. "A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993).

Finally, this Court finds that Bank of America has neither misled nor manipulated any court proceeding. Through its pleadings in the D & O litigation, Bank of America has not gained an unfair advantage over Prime One that compromises judicial integrity.

### CONCLUSION

For the foregoing reasons, the Court finds that Bank of America is entitled to the interpleaded funds.

The defendant Prime One's Motions for Judicial Notice [docs. # 117 & 134] of certain documents are GRANTED.

Pending is plaintiff's motion for attorneys' fees for $38,830 and disbursements of $284. Neither defendant has responded to this motion. The Court instructs both Bank of America and Prime One to file briefs in response to this motion that address 1) whether federal or state applies controls; 2) whether the attorneys' fees should be awarded against the interpleader fund; 3) whether a claimant should bear the cost of the attorneys' fees and disbursements; and 4) the reasonableness of the requested fees and disbursements. These briefs are due 20 days after this ruling's filing date.

The clerk is instructed to enter judgment in favor of defendant Bank of America, and to close this case.